ment he counts it an attack, and would feel justified in drawing his own weapon in self-defense! If their arms are not in sight they will pass without collision—and yet each is pre-pared in case of an assault. If both carried their arms displayed they would commence firing, on sight. If arms are carried openly the sentiments of society would impel a man to draw and use his weapon on very slight provocation. If his weapon is unknown, he never thinks of using it.

I know that I have not covered the whole scope of the act which, as it now stands, is wholly indefensible. The city ordinances on the same subject are just as bad and of doubtful value, even if they contained the limitations and exceptions suggested. Nor do I defend the practice of promiscuously carrying any sort of weapon; but the right to carry it is absolute and entirely independent of the question as to when it should be carried.

The theory of a complete disarmament, putting a stop to the "repeated homicides in our midst," is as vain as the hope that "age will fulfill the promises of youth." You might as well talk of reducing the number of conflagrations by prohibiting the use of matches. Matches are as useful to the incendiary as they are to the lamp-lighter. You cannot make a general disarmament. You succeed in disarming Lincoln and Garfield, and leave Booth and Guiteau armed to the teeth. The arms only of those who have them for a good purpose are reached, and the arsenal of the wicked remains as complete as before.

R. S. MORRISON.

━━●━━

## EX PARTE ROBINSON.

*(In the Superior Court of Denver, November 26th, 1883.—On Habeas Corpus.)*

1. CUSTODY OF INFANT. The right of a parent to the custody of an infant child is not absolute. When the parent has voluntarily parted with custody and seeks to regain it, the interests of the "infant will be considered, and, if of sufficient discretion, its wishes consulted;" and those considerations will be controlling.

2. SAME—YEARS OF DISCRETION. In this country the right of the child to determine as to its custodian does not depend on age alone; but its capacity, information, intelligence and judgment, are evidences which will be taken into the account, and from these, ascertained upon examination, the Court will determine whether it can take a comprehensive view of its situation and surroundings, and form an intelligent preference.

DAWSON, J. As to the facts involved in this proceeding, there is comparatively little controversy. They are substantially as follows: In March, A. D. 1883, Mrs. Caroline Robinson, the petitioner, arrived in Denver *en route* from England to the residence of relatives in the mountains in this State, accompanied by ten children, whose ages range from 5 to 18 years. Her husband, from some cause unexplained, remained in England. With her family she rested for a day or more in this city, and enjoyed the hospitality of Mrs. Fannie Hinman, the respondent, who, it seems, is a friend of the relatives to whom she was going. On that occasion something was said between petitioner and respondent about the latter taking, or being allowed to take, one of the children, but it was merely a casual conversation. Petitioner with her children passed on to her friends, who reside in Estabrook Park. Subsequently there was a correspondence between respondent and the relatives of petitioner, in which the latter also took part, which resulted in a proposition by respondent, contained in a letter to petitioner, to take one of the latter's children, either Katie (the child now in Court), or another, and care for, board, clothe, and educate it, with the understanding and upon the condition that she be allowed to retain the custody until the child should arrive at the age of 16 years, when the child might remain indefinitely, or leave, as she should then elect; and with the further understanding, as the respondent recollects it, that should the proposition be accepted, the child should only remain " if she and we are pleased," by which she meant to say, if the child and respondent were pleased. And such was the purport of the proposition as understood by all the other persons, three in number, who read the letter, except petitioner, who understood the proposition to be to the effect, that the child might remain so long as all three, *i. e.*, the child, petitioner, and respondent, might choose. The proposition was accepted with expressions of gratitude, and pursuant thereto Katie was sent by petitioner to respondent in May last, and has remained there since. Meantime, petitioner, with her other nine children, located, and now resides, in the city of Denver. It is admitted that petitioner is without means, save the labor of her children (the eldest three being sons) and herself, upon which to feed, clothe, care for, and educate her family;

and that respondent is a lady of ample means, and without small children, and that the position of Katie in the household is not that of a domestic, but a member of the family, every proper attention being given to her physical, mental, and moral training. It is also admitted that the petitioner is, in all respects, a fit person, morally and socially, to have the care, and superintend the training, of her daughter. It is further shown by the proof, and not controverted, that until a very short time before the filing of the petition, ten days or two weeks, there was no dissatisfaction upon the part of any of the parties concerned; that Katie visited her mother's family, and her brothers and sisters and mother visited her as often as either choose, and all was satisfactory. About that time some trouble arose between petitioner and respondent, and the former concluded to take Katie home. Whereupon, she sent one of her sons to respondent's house, with a message to the child to return home. The summons not being obeyed, she went herself to the house of respondent, and commanded Katie to accompany her home. The child declined to do so—respondent at the time saying, that if the child wished to go she might, but she should not be forced to leave her house unwillingly. Some further efforts and a second visit by the petitioner having failed to induce the child to leave respondent and return to the mother, these proceedings were instituted.

Respondent, in obedience to the writ, brought the child into Court, and in the return denies that she is in any degree restrained or detained by the respondent, but that she is and remains at the residence of respondent of her own free will, and at her own desire is permitted to so remain; and by way of further response sets up and relies upon as a contract, (the arrangement and agreement above stated) as conferring upon respondent the right to the custody of said child.

There are three leading considerations to be taken into account in reaching a determination of the controversy:

*First*—the rights of the petitioner.

*Second*—The rights of the respondent.

*Third*—The duty and interests of the child.

These considerations involve questions of law, and of duty and of conscience as well, of no little difficulty. Cases involv-

ing the possession of infant children are numerous in the books, and yet neither in the reported decisions nor in the text books have I been able to find an authority, or even a dictum, precisely in point. I find propositions and rules both in the text writers and opinions of Courts which pretty nearly approach some of the matters here involved; but each proposition and rule is founded upon a particular state of facts, none of which is precisely "on all four" with this case. This proceeding belongs to a class of cases each of which stands alone, and in each the circumstances must furnish the rules for its determination. The lines of demarcation between what the law accords to the parent as a right, or demands as a duty, of the child, and what conscience and equity require of the chancellor in view of all the considerations which may be addressed to him in the premises, are so delicately shaded into each other that it is often difficult to determine where the one ends and the other begins.

I will consider the propositions as stated above.

*First*—Then, as to the rights of the petitioner. She is the mother of the child, and the father being without the jurisdiction, she stands in his stead, and is, by natural as well as written law, entitled to the custody, control and services of the child, unless by some act of hers she is estopped to claim it, or from some other cause it is improper to allow the enforcement of the right. This primary and paramount right of a parent to the custody of a child is not an absolute one. While it is admitted as a rule that a parent may not make the custody of the child a mere matter of barter or bargain as a chattel, yet it is not true that the parent can in no circumstances bind himself not to assert his paternal rights. He may by contract part with the custody of his child and put it beyond his power, by law, to regain it. Being entitled not only to the custody but to the services of his child, a parent may let it to service or hire for a term, and, in the absence of any breach of covenant by the hirer, could not retract such contract and resume the custody at will. A parent by cruel treatment, neglect to properly provide for, or by immoral courses may forfeit the right to the custody of his child; but these are considerations which do not in any degree enter into this case, as none of them apply. The mother's treatment of the child is conceded to have been kind and affectionate; it is not questioned that she has both the dis-

position and ability to supply it with at least the necessaries of life, and her moral character is without reproach. There is the highest evidence that neither its intellectual nor moral nor religious training was neglected by the mother. So that unless she is estopped to demand the custody, or there exist some equally controlling reason to the contrary, she is entitled to have the child awarded to her.

*Second*—The rights of respondent. I do not think the power of a parent to dispose, for a limited period of the custody of an infant, is confined to the mode prescribed in section 1319 of the General Laws, though I doubt if the custody of such child for the whole period of its minority, can in this State be transferred otherwise than by indenture, deed or testament. Respondent in this case claims under a contract, to run for five years only, and I incline to the opinion that such a contract might be made and enforced. The question is: Was the arrangement as entered into between petitioner and respondent of such nature as to amount to a contract? I think not. And in reaching this conclusion, I take the view as stated by respondent, to wit, that she should have the custody of the child for five years, if they—that is, petitioner and child—should find the association agreeable. According to this statement the respondent could elect at any time to abandon the arrangement and return the child. It was unilateral and not binding for want of mutuality. (*Frue* v. *Houghton*, 3 Colorado Law Reporter, 303.) The proposition as understood by petitioner, makes a stronger showing for the right of respondent. That understanding was to the effect that the child should remain with petitioner for five years, provided all three of the parties interested were content. It might be said that acquiescence in the arrangement by all of the three parties for six months amounted to an expression of satisfaction, in virtue of which what was at first only a mutual proposition, had ripened into a contract. But the preponderance of the evidence is against this construction. I can very well see how, in the utmost good faith, the petitioner and respondent put each a different construction on the agreement. The latter says her proposition was to keep and care for the child until she became 16 years old if "she," that is the child, and "we" (meaning the writer and her household) were pleased. Petitioner might

well have understood the word "we," to refer to the writer and herself, and have accepted the proposition with that understanding—thus illustrating, what has already been stated, that there is no substantial conflict in the testimony—that is, nothing to induce a belief that either party has wilfully misstated any fact. I cannot say that the respondent can assert a right to retain the custody of the child under a contract, nor that the petitioner is estopped, by reason of sending the child to respondent in response to the proposition, to now assert claim to its custody. The only remaining question is:

*Third*—As to the duty and interest of the child: And herein resides the chief difficulty and delicacy of the case. The natural duty of every child requires obedience to all reasonable requirements of the parents, and that it contribute to the utmost of its ability to their comfort, happiness and support. In this respect the duty of parents and children is mutual and will be enforced by the Courts. If the facts in this case showed that petitioner required this child in order to minister to her wants in any degree, I should have no hesitation in holding that duty required it to do so, even at the sacrifice of present comfort and future prospects. But the contrary appears. Petitioner does not base her claim to the custody upon the fact that she needs the labor or any physical ministration from the child. On the contrary, she avows a willingness, desire and ability, by her own labor, aided by that of her sons, to provide for the comfort of, and suitably to educate and prepare the child for the duties of life. There can be no question of the genuine affection of this mother for this child—and the depth of a mother's affection can only be fathomed by a mother. It was this that prompted her to accept the proposition of respondent. She realized that with the care of nine other children upon her, with limited means, in a land of strangers, the father as though dead to both wife and children, it was indeed a fortunate thing that a home was offered Katie in which she could have more comforts and better advantages than all the wealth of a mother's love could bring—and hence the proposition of respondent was accepted, with expressions of gratitude, which were unquestionably genuine, real and deep. In the exuberance of her delight she forwarded the letter of respondent to friends in the old country, that they might share in her

pleasure, and that is the reason the letter is not in Court, and its contents must be proven. This state of affairs continued through a series of months, and I dare say would yet exist on the part of petitioner had not an unfortunate disagreement arisen between her and respondent. It appears to me quite clear that this proceeding is the result solely of that disagreement. Of course I will not assume that petitioner would willingly sacrifice the welfare of her child to gratify a mere personal pique. She no doubt, in the utmost sincerity, believes that in seeking to regain possession of the child she is endeavoring to promote its best interests. But is she?

The proof shows that petitioner, with her nine other children, is living in a house of but three rooms, and with no means of support other than that derived from the labor of herself and sons. No one will question that the child in her present home is more comfortable than the mother can possibly render it; nor that in the matter of education, especially in the higher departments of learning, respondent is in a position to furnish advantages beyond the reach of the mother. And it is at this point that the interests of the child appear and claim consideration.

It is seriously questioned by not a few intelligent persons whether one is better prepared for the battle of life by being brought up in ease and comfort, and liberally educated, than by being, in youth, inured to the hardships incident to poverty, and thus taught the value of labor and self-reliance. I shall not stop to discuss or consider this question. It strikes me as one, the solution of which depends in every case upon the individual person. The career of a person in life depends not so much on early surroundings as on capacity, tastes, aptitudes and above all, on opportunities. In this investigation we are not so much concerned with the proposition as to what is best for children in general, as what is for the best interests of this child. Are these interests contrary to the demand of the mother? and if so, are they paramount or subordinate thereto?

So far as the opinion of the witnesses goes—those actually examined and those present in Court, and what they would state admitted—there is an overwhelming preponderance to the effect that the interests of the child demand that she be allowed

to remain with respondent. The opinion and wishes of the child go to the same end. She was examined at length by the Court in the presence of petitioner and respondent and their respective counsel, and was cross-examined by the latter. Subsequently I made a very thorough and searching private examination. The result of these examinations has been to impress me that she is a child of unusual promise, possessing rare intellectual endowments, remarkably ripe and accurate judgment, and an understanding quite unusual in one of her age. It is her wish to remain with respondent. It cannot be conceded that a child may defy the authority of the parent and place itself in the custody of a stranger as it may wish. This would be to subordinate the lawful and natural right of the parent to the whim or caprice of the child. Yet it is a well settled rule of law that a child, after reaching years of discretion, in case of a controversy like this, "may have a voice in the selection of its own custodian. The practice is to give the child the right to elect where he will go if he be of the proper age. If he be not of that age, and want of discretion would only expose him to dangers, the Court must make an order for placing him in custody of a suitable person." (Schouler's Domestic Relations, Sec. 250.) In this country there is no fixed period when by law a child arrives at years of discretion. " It may be said to have arrived at that period when it becomes discreet—without regard to its age; when it can take a comprehensive view of its surroundings and prudently consider and decide questions affecting its personal welfare. Mental capacity and not any certain number of years is regarded with us as the true criterion of the child's qualifications to choose where choice is permitted." Hurd on *Habeas Corpus*, page 533.

Parents are sometimes whimsical and unreasonable, as well as children; and the interests of the child should no more be sacrificed to the caprice of the parent, than the right of a parent to the whim of his child. It therefore becomes important to test the judgment of both.

This is a girl almost 12 years old, as stated before, of unusual mental powers and development. In giving expression to her preference to remain with respondent, and the reasons upon which that preference is based, she impressed me as taking a

very intelligent view of the case. She said that she loved her mother, and her brothers and sisters, who had all of them been kind to her, but she preferred to remain with respondent, not, as counsel argued, " because she could there get more fine clothes," but because her mother did not need her, and respondent could furnish her a better home than it was possible for her mother to do; that respondent had been kind to her and she had come to love her as well as she loved her mother.

Treating of this subject, Hurd on *Habeas Corpus*, 529, has the following: " The welfare of the child being the object to be attained, no consideration calculated to influence the decision of the question should be overlooked. Hence the wishes of the child are consulted, not because it has a legal right to demand it, but because it is material for the Court to understand them, that it may be the better prepared to exercise its discretion wisely. It is not the whim or caprice of the child which the Court respects, but its feelings, its attachments, its reasonable preference and its probable contentment. Such being the nature and ground of the practice, it is impossible to prescribe the precise weight which should be given those wishes when ascertained. It may, however, be safely said that where the parent has voluntarily parted with the custody and seeks to recover it, if his right to recover it be doubtful, or the assertion of his claim would be inequitable to others or injurious to the child, the reasonable wishes of the child should be allowed a controlling influence."

Schouler's Domestic Relations, section 250, states the rule as follows: " It is sometimes a question in proceedings relative to the custody of minors, how far the child's own wishes should be consulted. When the object is simply that of custody, the rule, though not arbitrary, rests manifestly upon a principle elsewhere often applied, namely: that after a child has attained to years of discretion he may have, in case of controversy, a voice in the selection of his own custodian. The practice is to give the child the right to select where he will go, if he be of proper age."

In *State ex rel.* v. *Bratton*, 15 Am. Law Reg., N. S., the Supreme Court of Delaware held that " in all these cases the law has a tender regard for the natural affection and rights of the parent, and the welfare and happiness of the child; that if the

latter has reached the age of discretion, the Court, under a *habeas corpus*, in the exercise of a sound discretion, will remove all restraint, and allow it to make its own choice and go where it pleases.    *    *    *    The age of discretion is ascertained not only by the years of the child but by its capacity, information, intelligence and judgment.  The Court will look to all these evidences of capacity, and if it finds the child to reason sensibly, though as a child, in regard to its condition, and its preferences, and its prospects, it will take its wishes into consideration."  In *Commonwealth* v. *Hammond*, 10 Pick., 274, the child was between eleven and twelve, and its wishes were consulted.

In *People* v. *Chegary*, 18 Wend., 637, there were three children, aged respectively 15, 13 and 9 years.  They were all consulted respecting their wishes.  In *McDowle's* case, 18 Johns., 328, the youngest child was not more than 9 and was consulted in respect to its wishes not only by the Chief Justice, but afterwards, on suggestion that improper means had been used by the Master, by three gentlemen of the bar appointed by the Court, and its wishes respected.  In *State* v. *Scott et ux.*, 10 Foster, 274, the child was 11 years old.  The Court appointed a committee of three members of the bar to interrogate the child, who reported that she was of sufficient understanding to choose, and the Court suffered her to make her election.

In *State ex rel.* v. *Baird*, 3 C. E. Green, (7 Am. Law Reg., 700,) upon *habeas corpus* brought by the father for his children, it was decided that he would not, as matter of course, be entitled to them; but if the infants are of sufficient years of discretion to judge for themselves, they will be examined, and if they are satisfied and wish to remain, the Court will hold that they are not unduly deprived of their liberty, and will permit them to go with which of the parties they may elect.

These authorities are sufficient to show the general rule in this country upon this point.  They are in full accord with the articles from the *Irish Law Times*, republished in the *Central Law Journal*, pp. 325, 345, 364, relied on by counsel for petitioner.  At page 367 we have the following: "If the infant be of an age to select for himself, the Court will merely interfere so far as to set it free from illegal restraint, without handing it over to anybody.    *    *    *    By the English authorities    *    * the right to such election is held to depend upon age alone,

and not upon mental capacity. * * * But in America age is not the only criterion regarded. The child's capacity, of which its information, intelligence and judgment, ascertained by making or ordering a private examination, are evidences which will be considered."

Schouler's Domestic Relations, section 248, quoting from Justice Story, says: "It is an entire mistake to suppose that the Court is bound to deliver over the infant to its father, or that the latter has an absolute vested right in its custody. (*United States* v. *Green*, 3, Mason, 382.) The cardinal principle relative to such matters, is to regard the benefit of the infant; to make the welfare of the children paramount to the claims of either parent."

Upon a careful consideration of every aspect of this case, there does not appear to me to be any sufficient ground for coercing this child from the custody of respondent: The application of petitioner must be denied.

The judgment will be as follows: The above named Catherine Robinson, being brought into Court by Mrs. Fannie Hinman, upon a writ of *habeas corpus* heretofore awarded in this case, and the evidence and argument being heard, and the said Catherine, having been examined by the Court, and by counsel in open Court, and also by the Judge of the Court privately, and it appearing that she is almost 12 years of age, and is of competent judgment to make discreet choice in the matter, and she having expressed an unwillingness to be delivered up to Caroline Robinson, at whose instance the said writ was awarded, and a desire to remain under the care and in the custody of respondent, and, it appearing to the Court that the best interests of the child will not be subserved by returning her to the custody of her mother, the said Caroline, it is therefore adjudged and decreed that the said Catherine Robinson be restored to the custody of the said Fannie Hinman, and that the petition herein be dismissed. But the said Fannie Hinman is required to allow the said Catherine to exchange visits at proper and suitable times, with her mother, brothers and sisters.

*F. A. Naylor & Millet*, attorneys for petitioner.
*H. C. Dillon*, attorney for respondent.